**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**Ahmad JOHNSON** | Crim. No. 18-578-01 (KM)<br><br>**OPINION & ORDER** |

**MCNULTY, District Judge**

The defendant, Ahmad Johnson, is serving a 15-year sentence for drug trafficking, and is currently incarcerated at FCI Fort Dix. He now moves for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), primarily citing the COVID-19 pandemic and the resulting danger to himself while incarcerated. (DE 210)[1] He also argues that COVID measures have curtailed certain incentive-based programs, through which he might have shortened his sentence. The United States has filed a response. (DE 211; sealed, unredacted version, DE 211-2). Mr. Johnson is at no extraordinary risk, he has refused to be vaccinated against COVID, infection rates are currently zero at his institution, incentive programs have been limited but not eliminated, and the § 3553(a) factors weigh against release. The application will be denied.

---

[1] Unless otherwise specified, "DE __" refers to docket entry numbers in this case. "G__" refers to page numbers in the BOP records supplied by the government. (DE 211-1)

The motion of codefendant Maurice McPhatter (DE 209, 211), filed at about the same time, has been decided (DE 217). On March 22, 2022, codefendant Cory Canzater filed a similar motion (DE 216), which has not yet been fully briefed.

## I. BACKGROUND

Ahmad Johnson was the head of a drug trafficking organization that included his codefendants. On November 2, 2018, he pled guilty to a two-count Superseding Information. Count 1 charged that from February through June, 2017, he conspired to distribute and possess with intent to distribute at least one kilogram of heroin, 28 grams of cocaine base, and 40 grams of fentanyl, in violation of 21 U.S.C. 846. Count 2 charged possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). (DE 108–117) Under the Career Offender guideline, Mr. Johnson was exposed to an imprisonment range of 262–327 months. (Sentencing Tr. at 4 (DE 204)). On April 15, 2019, this Court varied downward and sentenced the defendant to concurrent sentences of 180 months' imprisonment on Count 1 and 120 months' imprisonment on Count 2. (DE 129, 204).

Mr. Johnson is currently serving that sentence at FCI Fort Dix. Assuming accrual of good time credit, his estimated date of release is March 17, 2030.

## II. LEGAL STANDARDS

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are

>    applicable, if it finds that--
>
>> (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
>>
>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D).[2] That policy statement was enacted at a time when only the BOP could move for compassionate release, however, and has not been amended since the enactment of the First Step Act. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under

---

[2] The application note lists three specific circumstances that qualify as extraordinary and compelling. Generally speaking, the enumerated circumstances include: (i) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover; (ii) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or (iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner. U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

the First Step Act, the court is not bound by that application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement does not limit what this Court, within its reasonable discretion, may find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, ––– U.S. ––––, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the

4

statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

### III. ANALYSIS

#### A. Exhaustion of remedies

Before proceeding to the merits of a motion for compassionate release, a defendant must meet § 3582(c)(1)(A)'s exhaustion requirement, which requires either that that the defendant has exhausted all administrative remedies, or that, since the submission of a request to the warden, 30 days have passed without a decision being rendered. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *United States v. Epstein*, Crim. No. 14-287, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (Wolfson, C.J., discussing binding effect of exhaustion requirement).

Mr. Johnson states that he made an administrative request for relief in May, 2021. BOP records obtained by the government do not reflect any such request. (*See* DE 211-1, *passim*.) Mr. Johnson has not made any reply to the government's argument, in its responding brief, that he failed to exhaust administrative remedies. For this reason alone, relief must be denied.

Still, because the exhaustion requirement may be contested factually, and to avoid duplicative motion practice, I will discuss the merits of this application in the alternative.

#### B. Compassionate Release

##### 1. Extraordinary and compelling medical circumstances

Mr. Johnson's First Step Act application for reduction of sentence is primarily based on the danger to his health from a COVID-19 infection while in the institutional setting of FCI Fort Dix. My review of the petition and the records supplied to the Court yields the conclusion that there are no extraordinary and compelling circumstances here.

Logically, any assessment of extraordinary circumstances arising from the COVID-19 pandemic must include (a) the likelihood that a COVID infection would have severe consequences for this particular person, and (b) the more

general danger of infection at the institution where the person is incarcerated.

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, [https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html](https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html) (updated as of Feb. 25, 2022) (cited herein as "CDC List"). "Older adults," *i.e.,* those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 80% of COVID deaths. *Id.* Certain listed medical conditions are also recognized as risk factors. These, in abbreviated form, are Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions ("and possibly high blood pressure (hypertension)"), HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

Mr. Johnson does not cite any specific medical grounds for relief, but the Court has reviewed his BOP medical records. He is approximately 43 years old and will be well under age 65 even at his estimated release date. Possible risk factors suggested by the records are obesity and hypertension. BPO records demonstrate that the defendant has been receiving regular, appropriate medical care.

Mr. Johnson's BMI of 34.7 (G 120) places him in the obese $\geq$ 30 range (but not severely obese $\geq$ 40 range). Obesity is a risk factor on the CDC List.

As to hypertension, the CDC List is more equivocal; it lists heart conditions as risk factors, and then adds that "*possibly* high blood pressure (hypertension) can make you more likely to get very sick from COVID-19." (CDC List, "Heart Conditions"; emphasis added). Mr. Johnson's medical records do include a diagnosis of primary hypertension. Readings generally seem to have

averaged around 133/89. (G 89) There are occasional higher spikes, however. In July 2020, his pressure was measured at a high 177/117, with a notation that he had not been taking his prescribed medication in the past year. (G 82) By August 17, 2021, however, his chart noted that "Based on his age, his blood pressure is well-controlled," and that his hypertension readings fell "within recommended blood pressure range." (G 46)

These chronic health conditions, although real, are common and not at all extraordinary. Courts have routinely denied compassionate release based on such conditions. Even in the pre-vaccine era, "[m]ultiple courts in this District have denied compassionate release to inmates suffering from hypertension and obesity because this lower degree of risk does not establish extraordinary and compelling reasons to justify release on its own." *United States v. Manon*, No. CR 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022), *citing United States v. Wax*, Crim. No. 14-251, 2020 WL 3468219, at *3 (D.N.J. June 25, 2020) (denying defendant's motion for compassionate release for lack of an extraordinary and compelling reason, even though he suffered from hypertension and obesity, because he was receiving regular and consistent medical care); *United States v. Falci*, Crim. No. 17-228, 2020 WL 3410914, at *1, *4 (D.N.J. June 22, 2020) (denying motion for compassionate release where defendant was 60 years old and suffered from obesity, hypertension, and other health issues); *United States v. Alexander*, Crim. No. 19-32, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) (denying compassionate release where defendant suffered from hypertension and obesity because defendant's health conditions are not sufficiently severe and medical records showed that BOP was "adequately managing defendant's medical care").

Mr. Johnson was offered the Moderna vaccine in March 2021, and was again offered the Pfizer vaccine in August 2021. On both occasions, he refused to be vaccinated. (G 142, 154–55) He reported no particular basis for refusal, but simply stated "do not want." (G 154)

Those vaccines are highly effective at preventing infection and, when

breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html; (updated Dec. 17, 2021). The wide availability of vaccines tends to render the COVID-19 risk less extraordinary or compelling. The rates are constantly changing, of course, but the CDC summarizes its effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** . . . .
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**
- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

The Seventh Circuit has taken a strong stance on refusal to be vaccinated, treating it as practically a disqualifier in most cases:

> [A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an "extraordinary and compelling" justification for release. The risk is self-incurred. . . . The federal judiciary need not accept a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated, when the responsible agencies all deem vaccination safe and effective . . . . A prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release.

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021).

One need not fully accept the Seventh Circuit position, however, to find pertinent the observations of the U.S. Court of Appeals for the Third Circuit in

8

a recent unreported case:

> . . . Thomas argues that his request was denied because he received the COVID-19 vaccine and this reasoning, if widely adopted, could perversely encourage inmates to decline the vaccine. We disagree. The District Court appropriately recognized that Thomas's vaccination reduced the health risks he relied on in support of his motion. This conclusion does not reward inmates who decline opportunities for vaccination. District courts routinely deny compassionate release to inmates who refuse the COVID-19 vaccine because they have voluntarily failed to mitigate the very health concerns they identify in support of an early release. *See, e.g., United States v. Brinson*, No. CR 19-153 (SDW), 2021 WL 2451970, at *2 (D.N.J. June 16, 2021) (Wigenton, J.) ("[B]ecause Defendant was offered and refused the COVID-19 vaccine, he cannot establish that 'compelling and extraordinary reasons' justify his release." (internal citations omitted)); *United States v. Sawyers*, No. CR 15-00070-RSWL-1, 2021 WL 2581412, at *4 (C.D. Cal. June 22, 2021) ("The glaring consensus among district courts is that refusal of a COVID-19 vaccine subverts a defendant's compassionate release motion."), *appeal dismissed*, No. 21-50157, 2021 WL 6196971 (9th Cir. Oct. 18, 2021).

*United States v. Thomas*, No. 21-1645, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022). In line with these *dicta* in *Thomas,* cases in this district denying compassionate relief have routinely taken into account a prisoner's refusal to be vaccinated. *See, e.g., United States v. Manon*, No. CR 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022) ("Despite being offered the COVID-19 vaccine and being "begged" by his medical provider to take the vaccine, Defendant has refused vaccination. . . . Clearly, Defendant is not in a condition 'that substantially diminishes' his ability 'to provide self-care within the environment of a correctional facility', as Defendant has rejected the opportunity for vaccination."); *United States v. Bonilla*, No. 20-0083, 2021 WL 3634181, at *2 (D.N.J. Aug. 17, 2021) (collecting cases holding that an inmate's refusal to be vaccinated in the absence of a legitimate medical reason was fatal to establishing an "extraordinary and compelling" reason for compassionate release).

9

A prisoner has the right to refuse vaccination, and such a refusal is not dispositive of the compassionate release application. That said, I am wary of creating a perverse incentive to forgo vaccination. There is, moreover, reason to be skeptical of a prisoner who claims to be in terror of losing his life, yet fails to take routine measures to protect himself against COVID-19 infection. If there were, for example, some particular medical contraindication or religious bar to vaccination, I might take that into account, but this record discloses none.[3]

I nevertheless consider the likelihood, going forward, of Mr. Johnson's contracting a serious COVID-19 infection at FCI Fort Dix, which is a low security facility housing 3,060 inmates, plus 204 inmates at a satellite camp. https://www.bop.gov/locations/institutions/ftd/index.jsp.

Within FCI Fort Dix, BOP reports, there have been some 2712 full vaccinations of inmates and 300 of staff. https://www.bop.gov/coronavirus/ As noted above, the vaccines are highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. The resulting herd immunity—on which the unvaccinated Mr. Johnson is apparently a free rider—tends to reduce further his risk of being infected.

Current and cumulative figures for COVID-19 infections at Fort Dix are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 0 | 0 | 2 | 0 | 1579 | 129 |

https://www.bop.gov/coronavirus/

To be sure, these figures, especially the "recovered" figures, reveal that over the past two years there were very significant positive COVID test results among the inmates and staff, including, tragically, two deaths. Not accounting for turnover in the inmate population, this would indicate a fatality rate of

---

[3]   Mr. Johnson, although recorded as "quarantined" and "recovered" in January 2021 (DE 211-1 at 4), does not state that he has suffered any COVID-19 symptoms. Rather, he cites lapses in procedures that have caused others to be infected. (Mot., DE 210)

10

approximately .06%.[4] Currently, the institution has no positive cases.

Mr. Johnson's risk of a COVID-19 infection or serious consequences therefrom is not high. I do not find that his medical circumstances are extraordinary and compelling.

### 2. Unavailability of programs

Mr. Johnson also complains that COVID-related restrictions have resulted in his inability to participate in certain incentive programs, which otherwise could have served as credits against the time remaining on his sentence.

Prison records show that Mr. Johnson participated in various drug treatment and enrichment programs through 2019, followed by a gap until mid-2021. Around May 2021, Mr. Johnson was again enrolled in a dozen or more cognitive, educational, and other programs. (DE 211-1 at 4–5) It is plausible that the gap is attributable to anti-COVID measures that remained in place until there was widespread vaccination of (other) inmates. Such restrictions no doubt caused hardship, but were manifestly necessary.

The effect, however, was limited to less than 18 months of a 15-year sentence. Mr. Johnson continues to enjoy ample opportunity to take advantage of educational and anti-recidivism programs designed to place him on a path to a law-abiding life once he is released. In the remaining years of his sentence, he may choose to enroll in more such programs. In short, access to such programs may have been suspended or delayed, but it has not been denied.

---

[4]   *I.e.*, 2 fatalities out of an inmate population of 3264. Presumably, these were concentrated in the pre-vaccine era, although the cumulative figures do not break down the fatalities or positive test results by date.

I note in passing that the FCI Fort Dix fatality rate of .06% is significantly lower than the rate in the community at large. The prison population and that of the outside community are not very comparable demographically. It is nevertheless instructive to cite the nationwide death rate from COVID-19: approximately 973,000 deaths in a population of 330 million, or about .29%. In New Jersey, there have been approximately 33,217 deaths in a population of 9.24 million, a fatality rate of approximately .36%. *See* https://covid19.nj.gov/forms/datadashboard.

11

I find nothing extraordinary or compelling about their temporary suspension that would warrant a reduction of sentence.

### 3. 18 U.S.C. § 3553(a) Factors

I review the factors under 18 U.S.C. § 3553(a) only briefly, but I have considered them all, as I did when sentencing Mr. Johnson three years ago. Even if the circumstances were extraordinary and compelling, I would necessarily deny relief on § 3553(a) grounds.

The offense conduct is quite serious. Mr. Johnson led an organization that trafficked in over a kilogram of heroin, as well as substantial amounts of crack cocaine and fentanyl. The evidence before the Court, including recorded conversations, indicated ongoing, willful drug dealing. In connection with that offense, Mr. Johnson possessed a .380 caliber pistol with ballpoint rounds. Intercepted conversations indicated that, on the day of the arrest, Mr. Johnson was carrying that gun on his way to meet with a person he was angry with.

Mr. Johnson, as I noted, had two prior drug convictions. His family ties, obvious intelligence, difficult early years, and sincere if belated remorse weighed in his favor. Currently, his willingness to take full advantage of rehabilitative programs, if not extraordinary, is commendable.

The sentence imposed reflected the goals of just punishment, general deterrence, and protection of the public. There is no need to belabor the harm caused by such trafficking, which must be punished and deterred.

As noted, the Career Offender guideline mandated an imprisonment range of 262–327 months. I granted a downward variance *sua sponte* to a sentence of 180 months, balancing the seriousness of the conduct against the positive aspects of the defendant's character, and taking into account that the age and severity of his prior convictions tended to overstate the seriousness of his criminal history. (Sentencing Tr. 19–20, DE 204)

Mr. Johnson was taken into custody in June 2017, and thus has served less than five years of a deserved fifteen-year sentence. The sentence I imposed was no greater than necessary to fulfill the statutory goals of sentencing under 18 U.S.C. § 3553(a). Those goals would be severely compromised by an order of

compassionate release at this time.[5]

### ORDER

**IT IS THEREFORE** this 28th day of March, 2022,

**ORDERED** that the petition for compassionate release under the First Step Act (DE 210) is DENIED.

The clerk shall send a copy of this opinion and order to the defendant/petitioner, Mr. Johnson, by regular first-class mail.

/s/ Kevin McNulty
_____
**KEVIN MCNULTY, U.S.D.J.**

---

[5] The motion, to the extent it may be seeking a transfer to home confinement, must be denied. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda,* 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden,* No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion.").

13